**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-01709-NYW

TIMOTHY LEE MILLER,

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This civil action arises under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-83(c), for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Timothy Miller's ("Plaintiff" or "Mr. Miller") application for Supplemental Security Income ("SSI"). Pursuant to the Parties' consent [#13], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#21]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## LEGAL STANDARDS

     SSI is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C.

§ 13382c(a)(3)(B).  The disabling impairment must last, or be expected to last, for at least 12 consecutive months.  *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002); *see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905.  And when a claimant has one or more physical or mental impairments, the Commissioner must consider the combined effects in making a disability determination.  42 U.S.C. § 1382c(a)(3)(G).  The earliest a claimant can receive SSI is the month following the month within which the claimant filed her application, and thus the claimant must establish that she was disabled on or prior to her application date.  *See* 20 C.F.R. §§ 416.200, 416.335; *see also id.* § 416.912(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application").

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail).  "The claimant bears the burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of proof at step five.  *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether substantial evidence supports the final decision and whether the Commissioner applied the correct legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted); *accord Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

## ANALYSIS

### I.  Background

#### A.  Medical History

Mr. Miller, born April 5, 1965, alleges he became disabled on May 1, 2015, at 50 years-of-age, due to mental problems/depression, psychotic, hernia, bad knees and ankles, irritability with people, dislocated shoulder, and diabetes. *See* [#10-3 at 86-87,[1] 89; #10-5 at 163; #10-6 at 175, 179, 185]. Because Mr. Miller's appeal focuses on his mental impairments and chronic pain, the following discussion focuses solely on those ailments.

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

Plaintiff began treating with Paul Freda, M.D. in 1993 following a nervous breakdown and attempted suicide. *See* [#10-2 at 54-55]. Dr. Freda diagnosed Plaintiff with Major Depressive Disorder Recurrent – Severe with Psychotic, *see* [#10-9 at 333; #10-10 at 411], and treatment notes from 2009 report that Plaintiff maintained his medication well in the past six months, that he felt like he had made progress in reducing his worry about his salvation, that he had successfully met his goal concerning his grief, and that he had improved his social interactions, *see* [#10-9 at 334]. A psychiatric exam revealed that Plaintiff was oriented and had an "okay" mood, consistent affect, average cognition/intellect, good insight to self, logical thinking, good problem solving, good emotional regulation, some pressured thoughts, no suicidal or homicidal ideation, good self-regulation, and some voices disturbing him. *See* [*id.*]. Dr. Freda noted on February 3, 2014 that Plaintiff was "[d]oing the best I have seen," and Plaintiff's August 22, 2014 psychiatric exam was normal as was his psychomotor activity, his mood was euthymic, his affect was pleasant, and he was good natured with emotional and behavioral stability. *See* [*id.* at 338-41].

Plaintiff saw his treating physician Jesus Perez, M.D. on January 7, 2015 for a follow-up on his diabetes and mood disorder, and Dr. Perez noted that plaintiff "cont[inued] to overall do well" and was a "[p]leasant patient in no acute distress." [#10-9 at 324]. Plaintiff returned to Dr. Perez on February 11, 2015, and Dr. Perez reported that Plaintiff was pleasant and in no apparent distress. *See* [*id.* at 322]. On March 3, 2015, Dr. Freda reported that Plaintiff was "[d]oing quite well" psychiatrically, that Mr. Miller's psychiatric exam was normal, that Plaintiff's psychomotor activity, mood, and affect were unchanged, and that Plaintiff "continue[d] to be his jovial self, very good natured and continue[d] with euthymia"; Plaintiff also stated he was "sleeping and eating well" and denied "elements of depression, anxiety, psychosis, hypomania or paranoia." [*Id.* at 346-48].

On May 14, 2015, Dr. Freda reported that Mr. Miller was oriented and had a logical and coherent thought process and content, normal speech and tone, good mood, consistent affect, erratic sleep, and daily thoughts of suicidal ideation with some plans but no intent. *See* [#10-10 at 412]; *see also* [*id.* at 420 (same as of May 24, 2016), 424 (same as of October 1, 2016)]. On May 18, 2015, Plaintiff presented to Dr. Perez, complaining of right shoulder pain after throwing a tire, though he retained good range of motion, *see* [#10-9 at 320]; Dr. Perez indicated that a shoulder x-ray was unremarkable and revealed, "No acute fracture or dislocation. No significant degenerative change. No focal lytic or sclerotic lesions" despite a history of pain. *See* [#10-8 at 268; #10-9 at 313]. On May 22, 2015, Dr. Freda noted that Mr. Miller's psychiatric exam was normal, he "denie[d] suicidal or destructive thoughts or urges and [did not] endorse elements of hypomania," and was sleeping and eating well, and Dr. Freda reported that Plaintiff was depressed and sad when discussing a recent DUI but his thoughts appeared logical and rational and he was "coping much better than he would have years ago." *See* [#10-9 at 350-53].

Dr. Freda reported that Mr. Miller was "[d]oing the best I have seen in a long time" on August 3, 2015, and Dr. Freda noted that Plaintiff's psychiatric exam was normal, that he met a woman online, he was coping better with his feelings toward God, he was sleeping and eating well, and had a euthymic mood and pleasant and cheerful affect. *See* [#10-9 at 354-57]. Plaintiff presented to Dr. Perez on August 5, 2015, complaining of "a little bit of LG shoulder bursitis" that was "almost 100% better, but still any kind of pushing, pulling action will kind of flare it up for a few days." [#10-9 at 316]. Dr. Perez also noted that Plaintiff denied "any arm numbness," had no new injuries or trauma, had a history of "bipolar with anxiety component," that Mr. Miller was not suicidal or homicidal and his medication was working well," that Plaintiff's physical exam was largely normal, and that Plaintiff would receive physical therapy. [*Id.* at 316-17]. Treatment notes

dated August 13, 2015 reveal that Mr. Miller was alert and oriented and answered questions appropriately. *See* [*id.* at 314].

On September 3, 2015, Plaintiff completed a Personal Pain Questionnaire and Function Report. *See* [#10-6 at 187, 189]. Mr. Miller averred that he struggled with daily aching pain in his knees, right shoulder, and ankle, which cold weather and movement exacerbated and which did not respond well to Aleve or Tylenol. *See* [*id.* at 187]. Mr. Miller also averred that he struggled with severe depression recurring with psychotic features and diabetes which, in combination with his other ailments, made it difficult to do house or yard work, work, concentrate, focus, or leave the house. *See* [*id.* at 190-94]. Despite being able to handle basic hygienic tasks, Plaintiff stated that his ailments made it difficult to lift more than 10 pounds, squat, bend, stand, reach, walk more than 1 block, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate more than 5-6 minutes, understand, follow instructions more than a recipe, use his hands, and get along with others. *See* [*id.* at 190, 194-95]. He also noted that his medications cause several side-effects, such as sleepiness, dizziness, drowsiness, sensitivity to light, diarrhea, and stomach issues. *See* [*id.* at 196].

Plaintiff's psychiatric exam was normal on November 19, 2015, and he "denie[d] suicidal or destructive thoughts or urges and really has no complaints of a psychiatric nature." *See* [#10-10 at 416-18]. Dr. Freda reported that Plaintiff had a euthymic mood, pleasant and cheerful affect, intact associations, logical and rational thoughts, and that there were no signs of clinical depression, anxiety, psychosis, hypomania, or paranoia. [*Id.* at 419].

On April 5, 2016, Mr. Miller's psychiatric exam was normal, and Dr. Freda noted that "[t]here seems to be a maturation process in progress," that Mr. Miller was coping with various life events (e.g., filing for bankruptcy and disability), was enjoying playing video games online,

6

was paying less than adequate attention to his appearance and hygiene, and had an euthymic mood, intact associations, logical and rational thoughts, and no evidence of suicidal, homicidal, hypomanic, paranoid, psychotic processes or breakthrough anxiety or palpable depression. *See* [#10-10 at 428-31]. Mr. Miller's psychiatric exam was also normal on July 27, 2016, and Dr. Freda reported that Mr. Miller "is really doing pretty good," which Mr. Miller acknowledged, e.g., "I'm doing a lot better," and presented emotionally stable with no changes in mood, affect, thoughts, associations, or cognition. *See* [*id.* at 432-34].

Treatment notes dated January 30, 2017, indicated that Mr. Miller was a "[p]leasant male patient in no acute distress," who had recently fallen on ice and was dealing with a tailbone contusion. *See* [#10-9 at 394]. On February 22, 2017, Dr. Freda noted that Mr. Miller was eating and sleeping well, was stressed awaiting his disability, had no psychiatric complaints, and presented with an euthymic mood, pleasant and cheerful affect, and "trademark fervent laughter and good-natured attitude"; Dr. Freda proclaimed, "He is the best I have seen ever." *See* [#10-10 at 438-39]. Mr. Miller presented to Dr. Perez for a physical on February 28, 2017, and treatment notes report that Plaintiff was a "very pleasant patient." [*Id.* at 382]. Dr. Perez's pre-operation treatment notes dated March 13, 2017 indicate that Mr. Miller was pleasant and in no acute distress and had normal gait and 5/5 strength in his upper and lower extremities. [*Id.* at 397].

### B.      Procedural History

On May 29, 2015, Plaintiff protectively filed his application for SSI. [#10-2 at 17; #10-3 at 85]. The Social Security Administration denied Plaintiff's application administratively on October 15, 2015. *See* [#10-2 at 17, 40; #10-3 at 85]. Mr. Miller requested a hearing before an Administrative Law Judge ("ALJ"), *see* [#10-4 at 106-14], which ALJ Bryan Henry ("the ALJ")

held on May 10, 2017, *see* [#10-2 at 17, 39]. The ALJ received testimony from the Plaintiff and Vocational Expert Jammie C. Massey (the "VE") at the hearing. *See* [*id.* at 17].

Plaintiff testified that nervous tension, hearing voices, medication side-effects, bad knees, bad ankle, bad back, and inability to stand prevent him from working, though his mental ailments and medication side-effects are the main reasons. *See* [#10-2 at 52-53, 60-63]. Plaintiff explained that he began treating for his mental ailments in 1993 following a nervous breakdown and attempted suicide, and that he was very suicidal in the past given his religious struggles and the loss of several loved ones, though his mental ailments have been "manageable" with treatment. *See* [*id.* at 54-55, 67]. As to his physical ailments, Plaintiff testified that he hurt his right shoulder, which he cannot lift anymore, and that he receives physical therapy for this ailment. *See* [*id.* at 55]. He also testified that his knees ache such that he cannot walk very far. *See* [*id.* at 69-70]. Plaintiff stated that he used to own a now defunct junkyard; he testified that his disability and inability to get along with his customers led to the collapse of his business. *See* [*id.* at 46-51].

When asked about his typical day, Mr. Miller relayed that the medications "help as far as the anxiety and the voices" but either make him tired or restless. *See* [#10-2 at 56, 59, 60, 81-83]. He continued that despite the medications he does not do well around other people because he irritates them or they irritate him. *See* [*id.*]. Mr. Miller also stated that he feeds his dog, cleans, waters plants, prepares food in the microwave, spends about 3-4 hours chatting with his girlfriend from England on the computer, that a friend helps take him places like the grocery store because he does not drive, and that he used to ride a motorcycle before having his motorcycle license revoked for driving under the influence. *See* [*id.* at 45-46, 57-59, 63-65, 73]. Other than speaking with his girlfriend on the computer, Plaintiff testified that he has no other hobbies, that he loses interest in books quickly, and has not watched television in 5 years. *See* [*id.* at 65-66].

The VE also testified at the hearing. *See* [#10-2 at 74]. The VE first identified Mr. Miller's past relevant work to include salvage, laborer, a specific vocational preparation ("SVP")[2] of 2, and a medium exertion job in the national economy but varying from light to very heavy exertion as performed. *See* [*id.* at 76].

The VE then considered several hypothetical individuals and the work they could perform based on certain limitations. First, the VE testified that an individual <u>could</u> perform Mr. Miller's past relevant work as generally performed if that individual could occasionally lift, carry, push, and pull 50 pounds and do so frequently with 25 pounds; sit, stand, and walk for six hours in an eight-hour workday; frequently climb ramps, stairs, and ladders and occasionally ropes and scaffolds; frequently stoop, crouch, kneel, and crawl; work at unprotected heights and around moving machinery; and perform simple routine tasks. *See* [*id.* at 77]. Second, the VE testified that an individual <u>could not</u> perform Mr. Miller's past relevant work if that individual could occasionally lift and carry 20 pounds and do so frequently with 10 pounds; never climb ropes, ladders, or scaffolds; occasionally crawl; frequently reach overhead on the right side; occasionally work around unprotected heights or around moving machinery; and perform only low stress jobs that require simple, routine, and repetitive tasks and no more than frequent simple work-related decisions. *See* [*id.* at 77-78]. But, the VE relayed, such an individual in hypothetical two <u>could</u> perform jobs as a housekeeper, routing clerk, and garment sorter—light exertion jobs with an SVP of 2—with routing clerk and garment sorter, as well as office helper, performable even if the

---

[2] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

individual in hypothetical two can only stand and walk for four hours, cannot be around unprotected heights or moving machinery, can frequently interact with the public, and can change postural positions while remaining on task. *See* [*id.* at 78-80]. The VE continued that no work existed if such an individual required more than one unscheduled/unexcused absence per month or was off task more than 10% of the time. *See* [*id.* at 80, 81]. The VE stated that her testimony was consistent with the Dictionary of Occupational Titles, the Selected Characteristics of Occupations, and her education and experience. *See* [*id.* at 80].

On July 21, 2017, the ALJ issued a decision finding Mr. Miller not disabled under the Act at step five because Mr. Miller could perform other jobs that existed in the national economy, consistent with his RFC, age, education, and work experience. [#10-2 at 17-31]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 1-8]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on June 6, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Mr. Miller challenges (1) the ALJ's step three conclusion that Mr. Miller's affective disorders did not meet or medically equal listings 12.03 and 12.04; (2) the ALJ's RFC assessment, including the weighing of Dr. Freda's opinions and assessing Plaintiff's credibility; and (3) the ALJ's conclusion at step five, based on faulty hypotheticals to the VE, that Plaintiff could perform light exertion jobs existing in the national economy. *See generally* [#16]. While the court would typically resolve these issues in accord with the five-step sequential analysis, because Mr. Miller's first issue necessarily hinges on the court's resolution of whether the ALJ

properly weighed Dr. Freda's treating source opinions, I first consider the ALJ's RFC assessment before turning to the ALJ's step three findings and then conclude with the ALJ's step five findings.

## II.      Step Four - The RFC Assessment

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. "'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")). If substantial evidence supports the RFC assessment, the court will not reverse the ALJ's decision even if it could have reached a different conclusion. *Ellison*, 929 F.2d at 536.

The ALJ determined that Mr. Miller retained the RFC to:

> perform light work . . . : The claimant can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit for six hours in an eight-hour workday. Except, he can stand and walk for four hours in an eight-hour workday. He can push and pull the same as he can lift and carry. The claimant can frequently climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can frequently stoop, crouch, and kneel. He can occasionally crawl. The claimant can reach overhead on the right frequently. He must be allowed postural changes in position at will remaining on task. He can never work around unprotected heights or moving machinery. The claimant can perform work that consists of only simple, routine, and repetitive tasks. He can work in a position that requires no more than frequent routine judgment, defined as being able to make simple work-related decisions. He can work in only a low stress job, defined as not requiring the worker to cope with work-related circumstances that could be dangerous to

worker and others. He can perform work that requires no more than frequent interaction with the public.

[#18-2 at 20-21]. According to Mr. Miller, substantial evidence does not support the ALJ's RFC assessment, because the ALJ failed to accord controlling weight to Dr. Freda's treating source opinions and erred in assessing Plaintiff's credibility. *See* [#16 at 17-21; #19 at 3]. I respectfully disagree.[3]

## A. Weighing the Medical Source Opinions

In assessing a claimant's RFC, the ALJ must also address medical source opinions. *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015). The Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant. The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions." (emphasis in original)). Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of a treating or examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir.

---

[3] To the extent Mr. Miller also argues that substantial evidence does not support the RFC assessment generally, *see* [#16 at 17, 19-20], I respectfully disagree. The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004). Upon review of the record, I find that substantial evidence supports the ALJ's RFC assessment.

2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6). *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted).

Dr. Freda offered two treating source opinions for Mr. Miller. The first, offered May 22, 2015, stated that Mr. Miller "is currently totally and completely disabled from gainful employment because of a mental illness." [#10-7 at 239]. The ALJ afforded this opinion little weight because the Commissioner is solely responsible for determining that a person is disabled, *see Campos v. Astrue*, 373 F. App'x 880, 883 (10th Cir. 2010) ("Medical source opinions on certain issues reserved to the Commissioner are not given controlling weight, even when provided by a treating physician." (citing SSR 96-8p, 1996 WL 374184, at *8 n.8 (July 2, 1996)); *see also* 20 C.F.R.

§ 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), and because it was internally inconsistent with Dr. Freda's treatment notes, which the ALJ discussed at length.  I find no error here.

The second, offered May 12, 2017, was a Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim.  *See* [#10-10 at 456]. Dr. Freda indicated that Mr. Miller's signs and symptoms were sleep disturbance, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking, hallucinations or delusions or paranoid thinking, generalized persistent anxiety, and motor tension. [*Id.*].  As to Mr. Miller's general limitations, Dr. Freda opined that Plaintiff had mild restriction of activities of daily living; moderate difficulty in maintaining social functioning; and presented deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner (in work setting or elsewhere) as well as repeated episodes of deterioration or decompensation in work or work-like settings which cause the patient to withdraw from the situation or experience exacerbation of signs and symptoms (which may include deterioration of adaptive functioning).  [*Id.*].

Dr. Freda's second opinion also assessed Mr. Miller's work limitations, which included <u>marked</u> limitations in his ability to: understand and remember detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and set realistic goals or make plans independently of others; and <u>extreme</u> limitations in his ability to: carry out detailed instructions, work in coordination with and proximity with others without being distracted by them, complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from

supervisors, and get along with coworkers or peers without distracting them. [*Id.*]. Dr. Freda based his opinion on his "years of experience" with Mr. Miller's "impaired social functioning, concentration, ability to focus and cognition," and explained that Mr. Miller showed "preoccupation with religion-related and spiritual guilt, markedly impaired frustration tolerance of others." [*Id.*]. Dr. Freda concluded, "I cannot see or imagine [Mr. Miller] in a work setting with other people for any length of time," and that Mr. Miller's limitations "were in effect on 5-22-2015 and still persist." [*Id.* at 457-58].

The ALJ likewise afforded this opinion little weight, believing that Dr. Freda overstated Mr. Miller's work-related limitations such as his ability to relate to others. *See* [#10-2 at 28]. The ALJ explained that psychiatric exams "chronicled normal findings," including normal psychomotor activity, euthymic mood, and "pleasant and cheerful" affect. *See* [*id.*]. And while acknowledging that the record supported Plaintiff's ongoing "religious-related anger issues," the ALJ found that the RFC assessment "account[ed] for [Plaintiff's] ruminative thoughts by limiting him to only simple, routine, and repetitive tasks." [*Id.*]. Ultimately, the ALJ concluded that the record (which the ALJ recounted in detail) did not support a finding that Mr. Miller could not complete a normal workday or workweek without interruptions from his psychological symptoms, as Plaintiff stated as late as February 2017 that he was keeping busy and displayed "logical and rational thoughts, clear cognition, and intact associations." [*Id.*].

Mr. Miller argues that the ALJ erred in affording little weight to Dr. Freda's second opinion because the ALJ did not consider the factors relevant to assigning a treating source opinion less than controlling weight. *See* [#16 at 18-20]. Mr. Miller continues that the ALJ instead rejected Dr. Freda's opinion in part because of the opinion of the state agency psychological consultant (a non-examining source), and that the ALJ ignored the length of Dr. Freda's treating relationship

with Plaintiff. *See* [*id.* at 19; #19 at 2-3]. The Commissioner argues, and the court agrees, that the ALJ adequately considered Dr. Freda's second opinion. *See* [#17 at 13]. That is, the ALJ rightfully highlighted the discrepancies between Dr. Freda's second opinion and his own treatment notes which were largely normal. *See* [*id.* at 13-14]. The Commissioner further contends that, despite assigning little weight to Dr. Freda's second opinion, the ALJ accounted for Plaintiff's mental limitations by restricting him to "simple work in a low stress environment with only frequent [sic] interaction with others." [*Id.* at 14].

Here, the court finds no error in the ALJ's weighing of Dr. Freda's second opinion. To start, the court agrees with the ALJ's decision not to assign controlling weight to Dr. Freda's second opinion, because "[t]he ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). As discussed above, Plaintiff's psychiatric exams were consistently normal, and Dr. Freda noted on several occasions that Mr. Miller was doing well with his mental ailments. *See, e.g.*, [#10-9 at 334, 338-41 (noting in February 2014 that Plaintiff was "[d]oing the best I have seen"), 346-48 (noting in March 2015 that Plaintiff was "[d]oing quite well"), 350-53, 354-57 (noting in August 2015 that Plaintiff was "[d]oing the best I have seen in a long time"); #10-10 at 412, 416-19, 420, 424, 428-31, 432-34 (noting in July 2016 Plaintiff was "really doing pretty good"), 438-39 (noting in February 2017 that Plaintiff was "the best I have seen ever")].

Next, the court finds that the ALJ adequately explained his reasons for affording Dr. Freda's second opinion little weight. As above, the ALJ highlighted the contrary and well-supported medical evidence that did not corroborate the severity of the restrictions Dr. Freda's

second opinion identifies. This is sufficient, because there is no requirement that the ALJ make a formulistic factor-by-factor finding so long as the court can discern the specific, legitimate reason(s) for the ALJ's decision. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (holding that the ALJ's discussion of contrary, well-supported medical evidence provided a sufficient basis for giving a treating source opinion very little weight, as the absence of an explicit discussion of the "factors for each of the medical opinions before him [did] not prevent th[e] court from according [the ALJ's] decision meaningful review."). The ALJ rightfully noted the inconsistencies between Dr. Freda's treatment notes and his second opinion. *See Barnhill-Stemley v. Colvin*, 607 F. App'x 811, 814-15 (10th Cir. 2015) ("Discrepancies between a treating physician's very restrictive functional assessment and that physician's contemporaneous treatment notes are a legitimate factor for discounting a medical opinion." (citing *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002)).

Nor does the court find error in the ALJ's weighing of the state agency psychological consultant's opinion. Contrary to Mr. Miller's assertions, the ALJ afforded this opinion only <u>moderate</u> weight because it was consistent with the medical record, and the ALJ even acknowledged that the medical record supported further restrictions on Mr. Miller's functionality than assessed by the state agency psychological consultant. *See* [#10-2 at 27]. And the ALJ, not the court, is responsible for resolving any inconsistencies between medical source opinions. *See Smith*, 821 F.3d at 1268; *cf. Medina v. Berryhill*, No. 16-CV-01339-NYW, 2017 WL 1862279, at *7 (D. Colo. May 8, 2017) ("[A]lthough the ALJ discredited Dr. Osborne's opinion, this fact alone does not support Mr. Medina's argument that the ALJ was required to accept Dr. Connolly's severe restrictions, and the court concludes that the ALJ did not err by picking a middle ground without adopting either opinion.").

Likewise, the ALJ did not err in failing to incorporate Dr. Freda's second opinion regarding Mr. Miller's (in)ability to complete a workday or workweek without interruption. The "ALJ, not a physician is charged with determining a claimant's RFC from the medical record[,]" and thus "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo*, 682 F.3d at 1288. For this reason, and those above, I find no error in the ALJ's weighing of Dr. Freda's second opinion.

### B.     Credibility[4]

"'Credibility determinations are peculiarly the province of the finder of fact' and the [court] will uphold such determinations, so long as they are supported by substantial evidence." *Ruh v. Colvin*, No. 13-CV-01255-PAB, 2015 WL 1517392, at *2 (D. Colo. Mar. 30, 2015) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). "Credibility determinations should not be conclusory, but instead 'closely and affirmatively linked' to evidence in the record." *Oliva v. Colvin*, No. 13-CV-02495-PAB, 2015 WL 5719645, at *7 (D. Colo. Sept. 30, 2015) (quoting *Kepler*, 68 F.3d at 391)). In addition to considering the objective medical evidence, the ALJ must also consider several factors, including the claimant's daily activities; the location, duration, frequency, and intensity of her pain; aggravating and mitigating factors; any medication taken and its effectiveness in providing relief; other treatment received aside from medications; other measures utilized to alleviate pain, *i.e.*, lying down; and any other factors that may bear on the

---

[4] Though SSR 16-3p superseded SSR 96-7p and eliminated the term "credibility", SSR 16-3p offers the same guidelines for ALJs to use in assessing a claimant's subjective complaints of symptoms and pain. *See* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). For this reason, the court will refer to this challenge as one speaking to Mr. Miller's credibility. *See Watts v. Berryhill*, 705 F. App'x 759, 763 n.4 (10th Cir. 2017).

claimant's functional limitations.  *See* 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016); *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010).

Mr. Miller argues that the ALJ erred by failing to credit Mr. Miller's allegations of chronic pain which made it difficult for him to stand or walk for six hours as required by light work.  *See* [#16 at 21].  The Commissioner counters that the ALJ properly reviewed the limited record concerning Mr. Miller's physical ailments and specifically accounted for any difficulties with standing and walking as the ALJ limited Mr. Miller to <u>four</u> hours of each, not the <u>six</u> he states in his opening brief.  *See* [#17 at 11].  Further, the Commissioner asserts that the ALJ discredited Plaintiff's subjective allegations of pain by noting that such complaints were disproportionate to the objective medical record which demonstrated unremarkable physical examinations and diagnostic testing.  *See* [*id.* at 11-12].  I respectfully agree with the Commissioner.

The ALJ's RFC assessment contains a narrative discussion of the pertinent medical evidence, as well as a discussion of Plaintiff's hearing testimony and Plaintiff's function reports submitted in support of his SSI application.  *See* [#10-2 at 24-27].  The ALJ then concluded that Plaintiff's statements and subjective complaints were not fully consistent and/or were inconsistent with the objective record, and in doing so the ALJ discussed the normal physical examinations, the sporadic records of Plaintiff's right should pain (which seemed to resolve), and Plaintiff's daily activities.  Upon review of the record, the court finds that the ALJ adequately assessed Plaintiff's subjective complaints of pain and properly tailored the RFC to only those subjective complaints borne out by the record.  Thus, the ALJ affirmatively linked his determination to substantial evidence and the court will not upset that determination.  *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (noting that

the ALJ need not consider every factor in assessing a claimant's credibility, because "common sense, not technical perfection, is our guide.").

## III.    Step Three

Step three of the evaluation process requires the ALJ to consider whether a claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005) (explaining that the ALJ must consider only whether any of the claimant's <u>severe</u> impairments, either singly or in combination, is equivalent to any listing). The severity of the impairments found in these listings precludes any substantial gainful activity. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Williams*, 844 F.2d at 751. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing[,]" and a claimant meets a listed impairment if her ailments satisfy all of the listing's criteria, 20 C.F.R. §§ 404.1525 (c)(3), 416.925(c)(3), or if her ailments medically equal a listing, *id.* at §§ 404.1526(a) (medical equivalence means "at least equal in severity and duration to the criteria of any listed impairment"), 416.926(a). The claimant's meeting or medically equaling a listing requires a conclusion of disabled and entitles the claimant to benefits. *See Davidson v. Sec'y of Health & Human Servs.*, 912 F.2d 1246, 1252 (10th Cir. 1990).

Mr. Miller argues that the ALJ erred by finding that Mr. Miller <u>did not</u> meet or medically equal listings 12.03 and 12.04. *See* [#16 at 14-16; #19 at 2-3]. Listing 12.03 governs schizophrenia spectrum and other psychotic disorders and listing 12.04 governs depressive, bipolar, and related disorders. A claimant may satisfy these listings with medical documentation of certain symptoms under Paragraph A (not at issue here) and either one extreme or two marked limitations in the following areas: (1) understanding, remembering, or applying information; (2) interacting with

others; (3) concentrating, persisting, or maintaining pace; and/or (4) adapting or managing oneself. Title 20, Chapter III, Part 404, Subpart P, Appendix A2, Listings 12.03, 12.04.[5]

Plaintiff argues that he satisfies the Paragraph B criteria, because he has <u>marked</u> limitations in his ability to understand and remember short and simple instructions; <u>extreme</u> limitations in his ability to carry out detailed instructions, work in coordination with and proximity with others without distraction, complete a normal workday or workweek; and "suffered from repeated episodes of deterioration or decompensation in work or work-like settings." [#16 at 15-16]; *see also* [#19 at 2]. In support, Plaintiff relies exclusively on Dr. Freda's second opinion. *See* [#16 at 15-16; #19 at 2].

The Commissioner argues that Dr. Freda's opinion does not actually correspond to the Paragraph B criteria under the applicable versions of listings 12.03, 12.04. *See* [#17 at 7-10]. But as discussed, the ALJ did not error in affording Dr. Freda's second opinion little weight, and thus nothing required the ALJ to find the same marked and extreme limitations as Dr. Freda. This is true regardless of whether Dr. Freda's second opinion corresponds with the applicable Paragraph B criteria. Rather, the ALJ found, based on the medical record, that Mr. Miller had only mild to moderate limitations under the Paragraph B criteria. *See* [#10-2 at 21-22]. I find no error at step three.

## IV.    Step Five

At step five of the sequential analysis "the burden of proof shifts to the Commissioner . . . to show that the claimant retains sufficient RFC to perform work in the national economy, given her age, education, and work experience." *Hackett*, 395 F.3d at 1171; 20 C.F.R.

---

[5] The court uses the version of these listings effective on July 26, 2017, the date on which the ALJ issued his decision.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  This also requires the ALJ to consider any exertional and nonexertional limitations that may impede the claimant's ability to perform the identified work and any impacts those limits have on the number of jobs available in the national economy that the claimant is functionally capable of performing.  SSR 83-14, 1983 WL 31254 (Jan. 1, 1983).  The Commissioner can meet her burden by the testimony of a vocational expert.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99, 1101 (9th Cir. 1999).

In passing, Mr. Miller takes issue with the ALJ's hypotheticals to the VE and the lack of any limitation relating to Mr. Miller's (in)ability to complete a normal workday or workweek.  *See* [#16 at 20].  Mr. Miller argues that this flaw fails to support the ALJ's conclusion that Mr. Miller could perform light work that existed in the national economy.  *See* [*id.*].  But an ALJ's hypotheticals must "include all (and only) those impairments borne out by the evidentiary record."  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).  And the only evidence as to such a limitation was Dr. Freda's opinion which the ALJ properly afforded little weight.  Indeed, ALJs are not required to "exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning.  The standard is one of reasonable good judgment."  *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997).  Thus, I find no error at step five.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.


DATED:  June 13, 2019                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge